UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

FILED

OCT 3 0 2003

No. 7:00-CV-123-BR

SARAH F. HALL d/b/a TRAVEL          )
SPECIALIST, et al., on behalf of themselves )
and all others similarly situated,           )
                                              )
                Plaintiffs,                   )
                                              )
        v.                                    )          ORDER
                                              )
UNITED AIR LINES, INC., et al.,              )
                                              )
                Defendants.                   )
                                              )

CLERK
US DISTRICT COURT, EDNC
DEP CLERK

This matter is before the court on the following motions:

A.      two motions in limine by various defendants to exclude the reports and testimony of
        plaintiffs' expert Dr. William S. Comanor ("Comanor") (D.E. #s 607, 637, and 700);

B.      two motions in limine by various defendants to exclude the reports and testimony of
        plaintiffs' expert Dr. J.C. Poindexter (D.E. #s 601, 702);

C.      a motion in limine to exclude the testimony of Bruce Bishins (D.E. # 764);

D.      a motion by various defendants to strike claims, exclude evidence, and preclude relief
        barred by prior litigation (D.E. # 599);

E.      a motion by defendant Airtran Holdings, Inc. ("Airtran") for summary judgment
        (D.E. # 597);

F.      a motion by defendants Alaska Airlines, Inc., Alaska Air Group, Inc., and Horizon
        Air Industries, Inc. (collectively, "Alaska") for summary judgment (D.E. # 603);

G.      a motion by defendant Frontier Airlines, Inc. ("Frontier") for summary judgment
        (D.E. # 605);

H.      a motion by defendant America West Airlines, Inc. ("America West") for summary
        judgment (D.E. # 613);



I. a motion by defendant Midwest Express Airlines, Inc. ("Midwest") for summary judgment (D.E. # 628);

J. a motion for summary judgment (the "joint motion") by defendants Northwest Airlines, Inc. ("Northwest"), American Airlines, Inc. ("American"), Continental Airlines, Inc. ("Continental"), Delta Air Lines, Inc. ("Delta"), and KLM Royal Dutch Airlines ("KLM") (collectively the "joint defendants") (D.E. # 625), and separate motions for summary judgment by American (D.E. # 598) and Delta (D.E. # 612)

K. a motion for summary judgment by defendant Air France (D.E. # 720);

L. a motion by plaintiffs for partial summary judgment on the issue of antitrust immunity with regard to Northwest and KLM (D.E. # 621); and

M. a motion by Continental, Northwest, Delta, and American to strike Comanor's 16 July 2003 report (D.E. # 843).

The motions have been fully briefed and are ripe for disposition.

## I. BACKGROUND

### A. Procedural History

Plaintiff Sarah Futch Hall ("Hall") owns and operates a travel agency and directly receives travel agent commissions from the defendant airlines for the purchase of airline tickets. See Third Am. Cplt. ¶ 2. On 21 June 2000, Hall filed a class-action complaint on behalf of herself and all other similarly situated travel agents alleging that the airlines had conspired to reduce base commissions in a concerted effort to force travel agents out of business in violation of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1 et seq. Hall has twice been permitted to amend her complaint, adding new defendants, additional class representatives, and new allegations against the defendants. The Third Amended Complaint, which is the operative complaint in this litigation, was filed on 17 May 2002.

The action has survived two rounds of motions to dismiss the complaint for failure to state

2

a claim pursuant to Fed. R. Civ. P. 12(b)(6). Only one defendant, Alitalia S.p.A., was dismissed on that ground, by order filed 19 August 2002. The action has been stayed as to defendants Trans World Airlines, Inc. ("TWA"), United Airlines, Inc. ("United"), US Airways, Inc. ("US Airways"), and Air Canada based upon Notices of Bankruptcy filed by those defendants. Defendant Midway Airlines Corporation, Inc. was dismissed without prejudice on 22 May 2001. Defendant Delta Airlines Global Services, Inc. was dismissed with prejudice on 20 July 2001. Defendant Deutsche Lufthansa AG ("Lufthansa") was dismissed with prejudice by order filed 24 September 2003 pursuant to a settlement agreement reached between Lufthansa and the class.

In their third amended complaint, plaintiffs allege that defendants have violated Section 1 of the Sherman Act by conspiring to cut, cap and/or eliminate the base commissions they pay to travel agents for sales of domestic and international airline tickets. Plaintiffs specifically allege that defendants have conspired to take the following actions:

1. In 1995, defendants Delta, American, Northwest, United, Continental, and TWA imposed a cap of $25 for commissions on one-way domestic tickets and a cap of $50 for commissions on round-trip domestic tickets, see Third Am. Cplt. ¶ 39;

2. Beginning in mid to late September of 1997, defendants American, United, Delta, Northwest, Continental, US Airways, and other named defendants reduced commissions payable on air travel tickets sold by travel agents from 10 percent to 8 percent, see id. ¶ 40;

3. Beginning in October of 1998, defendants American, United, Delta, Northwest, Continental, US Airways, and other named defendants imposed a cap of $50 for commissions on one-way international tickets and a cap of $100 for commissions on round-trip international tickets, see id. ¶ 41;

4. Prior to October of 1999, defendants United, Delta, Northwest, Continental, and American established the website Orbitz and used it to further divert commissions from travel agents, see id. ¶¶ 42-44;

5. Beginning on 7 October 1999, approximately fourteen of the defendants reduced commissions payable on air travel tickets sold by travel agents from 8 percent to 5 percent, see id.

¶ 45;

     6.    Beginning in August of 2001, defendants American, United, Continental, Delta, Northwest, US Airways, America West, Air Canada, and Frontier lowered the commission cap to $10 for sales of one-way domestic tickets and to $20 for sales of round-trip domestic tickets, see id. ¶ 46; and

     7.    Beginning on 14 March 2002, defendants Delta, American, Continental, United, Northwest, and US Airways eliminated base commissions paid for sales of domestic and international tickets by travel agents, see id. ¶ 47.

## B. Background History

     The airline industry in the United States was heavily regulated by the federal government through the Civil Aeronautics Board and subsequently through the Department of Transportation (the "DOT") until 1978. Dep. of Michael W. Gunn (American) ("Gunn Dep.") at 23. This regulation extended to base commissions[1] paid to travel agents, which the government set at 7 percent. Id.; see also Joint Defs.' Exh., App. III, Report of Defs.' Expert Dennis W. Carlton ("Carlton Report") at ¶ 12. The industry began to deregulate in 1978, and, after deregulating in 1980, base commissions rose over the next three years to "[a]t least 10 [percent] with . . . incentives above and beyond that on an individually negotiated basis . . . ." Gunn Dep. at 23; Carlton Report at ¶ 13 (citing July 1999 report of the General Accounting Office entitled *Domestic Aviation: Effects of Changes in How Airline Tickets are Sold*). See also Pls.' Br. Opp. Joint Mot. at 4.

     United "announced a commission change involving flat fee commissions in 1980 or 1981,

---

[1] The term "base commissions," which are at the heart of this litigation, refers to a payment by an airline to a travel agent of a percentage of the price of the ticket sold by the travel agent to a consumer. Dep. of Steve Sear (Northwest) ("Sear Dep.") at 38. Base commissions historically were publicly available information, were paid to all travel agents regardless of an agent's sales volume on a particular airline, and, after deregulation, were a payment set by each airline without any individual negotiations between the airline and the travel agent. Travel agents may also earn additional commissions from an airline under an individually negotiated incentive contract. These additional commissions, also known as "overrides," are considered "quite proprietary airline by airline." Gunn Dep. at 68; see also Dep. of William Brunger (Continental) ("Brunger Dep.") at 74-75; Dep. of Adolfo Lenza (Northwest) ("Lenza Dep.") at 74; Dep. of Sean Menke (Frontier) ("Menke Dep.") at 75.

4

and . . . announced a withdrawal several days or several weeks thereafter[,]" United's Ans. Pls.'

Third Am. Cplt. ¶ 38, when that commission action was not followed by other airlines, Third Am.

Cplt. ¶ 38.[2] In 1983, American attempted to initiate a cut in base commissions to which the travel

agent community voiced "violent[] oppos[ition]." Gunn Dep. at 25-26. Again, other airlines did not

match the proposed cut, and American rescinded it out of concern that it "would lose a lot of revenue

to [its] competitors by being noncompetitive on the [base] commission front . . . ." Id. at 26-31.

Since these failed attempts to cut base commissions in the early 1980s, "[t]he world has

changed materially . . . . [A] lot of [airline tickets are] distributed outside of the travel agent chain

today . . . ." Gunn Dep. at 35. The market has evolved "in terms of consumer behavior, online

technologies, the advent of [the website] Priceline and different things, as well as the majority of

[airline] customers actually paying travel agents themselves and just receiving the commission as

a [rebate on the ticket price]." Dep. of Lee Macenczak (Delta) ("Macenczak Dep.") at 265.

Significant advances in automation, including electronic ticketing, have reduced costs of distribution

both for airlines and travel agents. Fox Dep. at 84; Carlton Report at ¶¶ 8-9 (noting that e-tickets

_____

[2] This allegation was previously the subject of a motion to strike made by United and other defendants, which the court denied, finding that the allegation was relevant to plaintiffs' contention that a "reduction in commission rates would be contrary to defendants' economic interest if done unilaterally and independently." Order of 22 Feb. 2001 at 7. As evidenced from the language quoted by the court, United has acknowledged the commission action and subsequent rescission in its answer, but has essentially denied that the rescission was because other airlines did not match the action. However, the court will assume this to be the case for the purposes of the instant motions for summary judgment motion is to be viewed in the light most favorable to the non-moving party. Second, United has acknowledged that when it "reverted back" to percentage base commissions, it was aware that no other airline had matched the cut. Dep. of Christopher Bowers (United) ("Bowers Dep.") at 72-73. Third, the court notes that United only moved to strike the allegation on the ground that it is a "'[s]uperfluous historical allegation'" with "no connection . . . [to] the charges of a conspiracy on commissions" in the instant litigation, 8/1/00 Mem. Supp. Mot. Strike at 4, which is not an attack on the accuracy of the allegation. Finally, there is more than adequate evidence that airlines considering initiating base commission reductions would likely rescind those cuts if they were not matched by competitors, and airlines considering matching base commission cuts did not think the implemented cuts could be sustained in the marketplace absent substantial matching. Bowers Dep. at 28-29; Dep. of Theresa Fox (US Air) ("Fox Dep.") at 36; Gunn Dep. at 74-76, 109-110; Sear Dep. at 27.

were introduced in 1995 and "accounted for 30 to 60 percent of all domestic airline tickets sold" by 1999). See also Joint Defs.' Exh., App. IV, Tab 1 (DOT, Office of Aviation & Int'l Affairs, *Report to Congress – Efforts to Monitor Orbitz* (June 27, 2002)).[3] Finally, many airlines now focus on individual relationships and negotiated incentive contracts with specific travel agents rather than dealing with "the entire [travel agent] community at large." Gunn Dep. at 34; see also Macenczak Dep. at 266; Dep. of Kenneth Pomerantz (Northwest) ("Pomerantz Dep.") at 91-92; Dep. of Barbara Cusumano (Lufthansa) at 239; Fox Dep. at 114; Decl. of Francesca Crescimano-Zilli (Air France) at ¶ 18.

## II. DISCUSSION

The court turns first to the motions for summary judgment, because resolution of those motions could render the other motions moot.

### A. Defendants' Motions for Summary Judgment

#### 1. General Discussion

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. "To prove a violation of the Act, a plaintiff must establish two elements: (1) there must be at least two persons acting in concert, and (2) the restraint complained of must constitute an unreasonable restraint on interstate trade or commerce." Estate Const. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 220 (4th Cir. 1994). "A plaintiff in a Section 1 conspiracy can establish a case solely

---

[3] While the DOT report "do[es] not immunize [defendants] from antitrust liability, [it is] entitled to weight in considering whether [plaintiffs have] stated a claim." Virgin Atlantic Airways Ltd. v. British Airways PLC, 872 F. Supp. 52, 63 n.2 (S.D.N.Y. 1994).

6

on circumstantial evidence and the reasonable inferences to be drawn therefrom, and the movant defendant for summary judgment bears the burden of proving that drawing inferences of unlawful behavior is unreasonable." In re Baby Food Antitrust Litig., 166 F.3d 112, 124 (3rd Cir. 1999).

"While the summary judgment standard of Fed. R. Civ. P. 56 for an antitrust suit is the same as that for any other action, the application of Rule 56 to antitrust cases is somewhat unique. The inferences to be drawn from underlying facts on summary judgment must be viewed in a light most favorable to [plaintiffs]." Merck-Medco Managed Care, LLC v. Rite Aid Corp., No. 98-2847, 1999 WL 691840 at **4 (4th Cir. Sept. 7, 1999)(unpublished). But it is important to note that

> antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case . . . . [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently.

Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986)(internal citations omitted). "'In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard.' Accordingly, the prism, through which we here appraise the propriety of Summary Judgment, is the law of antitrust, as that law has evolved in the unique environs of an oligopolistic market." In re Potash Antitrust Litig., 954 F.Supp. 1334, 1347 (D. Minn.)(quoting Nebraska v. Wyoming, 507 U.S. 584, 590 (1993)), aff'd on reh'g en banc sub nom. Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc., 203 F.3d 1028 (8th Cir.), cert. den. sub nom. Hahnaman Albrecht, Inc. v. Potash Corp. of Saskatchewan, Inc., 531 U.S. 815 (2000).

The Fourth Circuit has held that to survive a motion for summary judgment, antitrust plaintiffs "must discharge a twofold evidentiary burden. First, they must establish that [each

defendant] had a 'conscious commitment to a common scheme designed to achieve an unlawful objective.' Second, [plaintiffs] must bring forward evidence that excludes the possibility that the alleged coconspirators acted independently or based upon a legitimate business purpose." Laurel Sand & Gravel, Inc. v. CSX Transp., Inc., 924 F.2d 539, 543 (4th Cir.), cert. denied, 502 U.S. 814 (1991). See also Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1324 (4th Cir. 1995). When there is no direct evidence of antitrust activity, as in the instant case, "an agreement to restrain trade may be inferred from other conduct." Laurel Sand, 924 F.2d at 542. However, "[t]o prove a violation through ambiguous conduct, proof must be offered that tends to exclude the" possibility that the "suspected agreement may be found consistent with . . . independent conduct or a legitimate business purpose." Laurel Sand, 924 F.2d at 543. See also Merck-Medco, 1999 WL 691840 at **8.

Plaintiffs must produce evidence with respect to each defendant that is alleged to be part of the conspiracy. See In re Citric Acid Antitrust Litig., 191 F.3d 1090, 1102 (9th Cir. 1999); AD/SAT v. Associated Press, 181 F.3d 216, 234 (2nd Cir. 1999); City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548 (11th Cir. 1998); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224 (3rd Cir. 1993); Merck-Medco, 1999 WL 691840 at **8-15. Therefore, although it is certainly true that "a court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action[,]" Petruzzi's IGA, 998 F.2d at 1230, the court "will nonetheless consider [plaintiffs'] allegations, defendant by defendant, to provide a logical structure to [its] analysis." Rossi v. Standard Roofing, Inc. 156 F.3d 452, 467 (3rd Cir. 1998). See also Alexander v. Phoenix Bond & Indem. Co., 149 F. Supp. 2d 989, 1000 (N.D. Ill. 2001)(court "will analyze each defendant

8

individually because, even in a conspiracy case, liability remains individual and is not a matter of mass application")(citing <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946)).

With these principles in mind, the court turns to the motions for summary judgment.

*2. Defendant AirTran*[4]

On 7 October 1999, defendant United cut its travel agent base commissions from 8 percent to 5 percent. Third Am. Cplt. ¶ 45. Between 7 October and 20 October 1999, fourteen other airlines cut travel agent base commissions from 8 percent to 5 percent. <u>Id.</u> On 20 October 1999, AirTran cut travel agent base commissions from 8 percent to 5 percent.[5] 15 Nov. 2002 Report of Pls.' Expert Robert D. Willig, Corrected Exh. C. When AirTran took this action, only two of the defendant airlines had not yet done so: Frontier, which cut its base commissions on 2 November 1999, and Lufthansa, which cut its base commissions on 17 December 1999. <u>Id.</u> Plaintiffs do not dispute that AirTran did not participate in the September 1997 base commission cuts, nor did it participate in the August 2001 domestic base commission caps or the March 2002 base commission eliminations. <u>See</u> Pls.' Br. Opp. at 22.[6] "Plaintiffs do not contend that [AirTran] was involved in the planning or

---

[4] AirTran Holdings, Inc., is named as a defendant in plaintiffs' Third Amended Complaint. "AirTran Holdings, Inc., is a holding company that itself conducts no [airline] operations[,]" AirTran's Br. Supp. Mot. Summ. J. at 1 n.1, and the court questions the viability of plaintiffs' claims against this defendant on that basis alone. However, AirTran did not brief the court on this issue, and in fact has chosen "to proceed as if other AirTran entities are included in the litigation," <u>id.</u>, and the court will also proceed accordingly.

[5] At this point, the court reminds the parties that although it previously held, in ruling on a motion to dismiss, that a delayed "interval between alleged conspiratorial acts cannot" prove that those acts were not parallel, Order of 16 August 2002 at 11-12, the court also noted at that time that the same defendant "might be able to show at the summary judgment stage that [a] . . . commission reduction was consistent with rational, unilateral conduct and was not part of a pattern of uniform business practices," <u>id.</u> at 12. Therefore, the court considers this and other defendants' arguments regarding delays between commission actions not as dispositive of whether they indicate independent action, but rather, whether they indicate independent action when considered in combination with other evidence.

[6] Pursuant to the court's order filed 9 January 2003, plaintiffs filed one brief in opposition to five individual motions for summary judgment brought by defendants AirTran, America West, Frontier, Midwest Express, and

9

implementation of the original conspiracy to reduce commissions. Plaintiffs claim, instead, that [AirTran] knowingly joined the pre-existing conspiracy planned and implemented by the major airlines." Id.

Although AirTran was "not implicated in the earlier price-fixing and *ATP* litigation,"[7] plaintiffs argue that AirTran has a "[h]istory of [p]ast [c]ollusion" because three of its executives are former employees of airlines that were involved in prior antitrust litigation. Pls.' Br. Opp. at 31-32. This "link" between AirTran and the alleged conspiracy that is the subject of this litigation is tenuous at best, and completely unconvincing at worst.[8] Notably absent from plaintiffs' brief and supporting evidence – despite months of depositions,[9] interrogatories, and requests for production of documents – is any specific evidence that these three people were involved in the alleged conspiratorial activity

Alaska. This brief was not to exceed 42 pages. While the brief itself is only 41 pages long, the court notes that it makes numerous, substantive references to plaintiffs' brief in opposition to the joint motion for summary judgment. See, e.g., Pls.' Br. Opp. at 8 (referring the court to pages 19-24 of their other brief), 9 (referring the court to pages 15-19 and 27-37 of their other brief), 10 (referring the court to pages 27-29 of their other brief), 11 (referring the court to pages 34-37 of their other brief), 12 (referring the court to pages 63-65 of their other brief), and 15. Not only does this essentially lengthen plaintiffs' brief well beyond the allotted 42 pages, it also forces the court to jump back and forth between two different briefs and two sets of exhibits, as plaintiffs have not only cited to argument contained in their other brief, but also to "portions of the record cited therein."

[7] "The *ATP* litigation" refers to the case of United States v. Airline Tariff Pub. Co., 836 F. Supp. 9 (D.D.C. 1993), in which the United States brought an action against eight domestic airlines and the Airline Tariff Publishing Company ("ATP"), alleging that the defendants used ATP's fare dissemination system to fix airline ticket prices in violation of the Sherman Act by "signaling" other airlines on desired price changes. The term "signaling" is described in more detail infra at n.15. The *ATP* litigation was resolved by entry of a consent judgment enjoining defendants from engaging in certain practices "without trial or adjudication of any issue of fact or law[,] . . . . [which] shall not be evidence against or an admission by any party with respect to any issue of fact or law." U.S. v. Airline Tariff Pub. Co., No. 92-2854 (SSH), 1994 WL 502091 at *1 (D.D.C. Aug. 10, 1994).

[8] Tad Hutcheson, AirTran's Director of Marketing, is perhaps the best example of the weakness of plaintiffs' allegations against AirTran. The court notes that he came to work for AirTran in June 1997, three months before the September 1997 commission cut that triggered this litigation, from KIWI International Air Lines, who is not a party to this litigation, nor apparently to any of the prior litigations. See Pls.' Br. Opp., Exh. PX1167. Plaintiffs point to the fact that Mr. Hutcheson has also worked in the "planning and marketing departments at Delta Air Lines" but fail to show how Mr. Hutcheson could possibly have been involved in any of the conspiratorial activity alleged by plaintiffs.

[9] It appears that plaintiffs did not depose anyone at AirTran. See AirTran's Reply Br. at 3.

10

Case 7:00-cv-00123-BR   Document 866   Filed 10/30/03   Page 10 of 42

while they were employed by the other defendant airlines, or that they somehow implemented the conspiracy once they came to work for AirTran. Moreover, there appears to be "no case law . . . where 'history of collusion' is used as a plus factor courts consider in cases alleging illegal collusion in an oligopolistic market. The . . . 'history of collusion' in the industry does not tend to exclude the possibility that Defendants were engaged in lawful conduct during" the period relevant to the complaint. Holiday Wholesale Grocery Co., et al. v. Philip Morris Inc., et al., 231 F. Supp. 2d 1253, 1305 (N.D. Ga.), aff'd sub nom. Williamson Oil Co., Inc. v. Philip Morris USA, ___ F.3d ___, 2003 WL 22171708 (11th Cir. Sept. 22, 2003).[10]

Although plaintiffs are correct that one may join a conspiracy after it has begun and thus incur liability for the acts of the entire conspiracy, see Pls.' Br. Opp. at 23-24, plaintiffs must show "evidence from which reasonable men could conclude that [AirTran] joined the conspiracy with knowledge of the unlawful enterprise and acted to further it." United States v. Reynolds, 511 F.2d 603, 607 (5th Cir. 1975). Plaintiffs have not done so, and AirTran's motion for summary judgment must be allowed.

---

[10] While the instant motions were pending before the court, the Eleventh Circuit Court of Appeals decided this case on appeal by published opinion, "affirm[ing] in all respects the district court's final summary judgment in favor of the [defendants]." Williamson Oil, 2003 WL 22171708 at *35. The Eleventh Circuit specifically noted that "the district court's treatment of the wealth of complicated issues in this case was nuanced, insightful and, ultimately, correct." Id. at *1. Therefore, the court cites to the district court and appellate court opinions as appropriate. A copy of the Eleventh Circuit opinion was furnished to the court by the joint defendants on 24 September 2003 pursuant to Local Rule 7.1(g). On 6 October 2003, plaintiffs filed a "Response to Defendants' Notice of Supplemental Authority" questioning the applicability of the opinion to the motions before the court on several grounds, including an argument that the Eleventh Circuit's analysis would be incorrect under Fourth Circuit standards. See Pls.' 10/6/03 Resp. at 3 (arguing the Eleventh Circuit does not recognize certain plus factors that are recognized in the Fourth Circuit). Plaintiffs' arguments will be addressed in more detail infra, but the court sets the issue out here briefly to note that the court agrees with plaintiffs' response to the extent that it states that Fourth Circuit analysis is binding on the court, and that the court applies Fourth Circuit analysis even when citing to other case law it finds persuasive and applicable.

## 3. Defendant Alaska

Although the first caps on domestic commissions were implemented in 1995, Alaska did not cap commissions on domestic tickets until November 2001. Pls.' Br. Opp. at 4. It was the second to the last defendant to cut commissions from 10 to 8 percent in 1997. Id. Along with defendants America West and Midwest, Alaska was third to last in cutting commissions from 8 to 5 percent, after 9 other defendants had done so. Id. It eliminated commissions over two and one half months after the first airline (Delta) eliminated commissions, and along with defendant Frontier, was the second to the last airline to do so. Id. It capped commissions on international tickets over ten months after other airlines did so. Alaska's Br. Supp. Mot. Summ. J. at 1. "Alaska . . . never attended any of the meetings . . . of the founders of Orbitz[,] . . . the Passenger Tariff Coordinating [Conference] [("PTCC"),] . . . [or] the International Air Transport Association [("IATA"),]"[11] meetings that plaintiffs argue gave defendants the opportunity to conspire.[12] Id. at 2; see also Mot. Summ. J. Exh. C (Aff. of Craig Battison) at ¶¶ 6-7. Alaska is neither an equity owner in Orbitz nor a member of the PTCC. Id.

Plaintiffs point to Alaska's status as a defendant in the *ATP* litigation and as a member in the IATA and the Air Transport Association ("ATA") in their attempt to argue that Alaska participated

---

[11] The PTCC is a conference within the IATA. For a more complete explanation of the history and purposes of the IATA and PTCC, see Joint Defs.' App. III (8 October 2002 Report of Joint Defs.' Exp. Witness Bert W. Rein ("Rein Report")).

[12] Specifically, plaintiffs point to base commission cuts and caps which occurred after meetings of these various organizations in support of their contention that these organizations facilitated antitrust activity. See Pls.' Br. Opp. at 8-9; Pls' Br. Opp. Joint Mot. at 12. However, if Alaska did not join these organizations or attend these meetings, it is difficult to see how it could have the opportunity to conspire on travel agent commissions. Furthermore, "opportunity to conspire" without a showing of actual conspiracy is insufficient to create a plus factor which would survive summary judgment. See infra p. 19.

in the alleged conspiracy. Pls.' Br. Opp. at 8-9.[13] However, "[m]ere membership in a trade association [and] attendance at trade association meetings . . . are not, in and of themselves, condemned or even discouraged by the antitrust laws . . . . There must instead be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a[n antitrust] violation . . . ." Moore v. Boating Indus. Ass'n, 819 F.2d 693, 712 (7th Cir. 1987). See also In re Citric Acid Antitrust Litig., 191 F.3d at 1098.

In fact, plaintiffs have shown *no* evidence of knowledge of or participation in any illegal scheme by Alaska *whatsoever*, while Alaska has submitted overwhelmingly convincing evidence that each base commission action it took was the result of independent consideration of the state of the market. See Alaska's Mot. Summ. J. at Exh. C (Aff. of Gregg Saretsky) at ¶¶ 12-20 (describing in detail Alaska's analysis of base commission cuts and caps implemented by other airlines); Exh. D (Aff. of Iain McPhie) at Tabs 5 (interoffice memo instructing employee to look for market shift away from United after United implemented 8% base commission cut), 8-9 (analyzing impact of commission cuts on various travel agencies), 13 (email stating that American's 2001 $20 base commission cap will be looked at but not immediately acted upon), 16 (analyzing savings of base commission cuts to Alaska and discussing possible alternative commission programs for certain travel agencies), 18 (email stating that "Alaska sets our own policy with regard to commission

---

[13] Plaintiffs also assert that Alaska is a "'Domestic Airline Partner[] . . . in the Hotwire web site, an Orbitz partner launched in October 2000" through the membership of its affiliate Aloha Airlines, Pls.' Br. Opp. at 8, but it appears that this assertion is incorrect. See Alaska's Reply Br., Exh. 1, Tab C (listing Hotwire Domestic Airline Partners and noting that Alaska is not listed as an airline having an agreement with Aloha Air). Plaintiffs also state that Alaska "is an alliance partner with American, Northwest, KLM, and Continental." Pls.' Br. Opp. at 21. Although the court is uncertain of the meaning of the term "alliance partner," and plaintiffs neither elaborate on the meaning of this term nor demonstrate how being in such an alliance tends to exclude the possibility that Alaska engaged in unilateral conduct, Alaska states that these "alliances" are "simply . . . code-sharing arrangements with those (and certain other) airlines on specific routes[,]" Alaska's Reply Br. at 7, and the court is satisfied that this argument in opposition to the motion for summary judgment is without merit.

amounts").

Plaintiffs also place great emphasis on the fact that Alaska and the other smaller airlines matched each base commission cut rather than simply eliminating base commissions altogether. Pls.' Br. Opp. at 12-13. According to plaintiffs, matching the base commission cuts, "rather than paying no base commission, is more consistent with an agreement to fix base commissions than it is with independent action and competition." Id. at 12. However, it is perfectly legitimate for an airline to consider publicly available information about what a competitor is paying travel agents in setting one's own commissions for travel agents. See Wallace v. Bank of Bartlett, 55 F.3d 1166, 1169 (6th Cir.)(antitrust defendants accused of price collusion "naturally are interested in surveying the market to determine what other [defendants] are charging in order to make strategic competitive decisions"), cert. denied sub nom. Baker v. Bank of Bartlett, 516 U.S. 1047 (1996). Alaska's motion will be allowed.

*4. Defendant Frontier*

Plaintiffs launch two arguments in an attempt to show that Frontier knowingly participated in a conspiracy to cut travel agent commissions. First, plaintiffs argue that two of Frontier's base commission cuts occurred too quickly after the initial announcement to be the result of a reasoned, independent study of the market[14] and that Frontier's decision not to cap base commissions was "meaningless" in light of its average ticket price. Pls.' Br. Opp. at 15-16. Second, plaintiffs argue that because two of Frontier's executives have prior employment experience with named co-

---

[14] According to plaintiffs, the time between a major airline's decision to cut commissions and Frontier's decision to do so ranged from 18 days to 6 ½ months. Pls.' Br. Opp. at 4. Plaintiffs' own economic expert only states that "[n]o . . . analysis or consideration [of the risks and benefits of reducing base commissions] could take place *within the day or two* that transpired before most rival airlines followed the leader's action to reduce commissions." 8/20/02 Comanor Report at 17 (emphasis added).

14

conspirators and/or defendants in the *ATP* litigation, Frontier "cannot disassociate [itself] from the *ATP* . . . litigation, or claim ignorance of the signaling practices giving rise to the government action."[15] Pls.' Br. Opp. at 32.

With regard to Frontier's reaction to commission cuts and caps initiated by other airlines, Frontier has offered the declarations of its Chief Executive Officer and affidavits of its Vice President of Market Planning and Revenue Management indicating that its actions were not "made [after] consultation or agreement with any other airline[,]" but instead were made after analyzing the market to determine whether maintaining the higher commissions would result in increased market share. Frontier's Mot. Summ. J., Exh. P (Suppl. Aff. of Sean Menke) at ¶ 6; see also Exh. C (Decl. of Jeff Potter)("Potter Decl.") at ¶¶ 11-18. Furthermore, Potter's declaration offers very specific evidence that Frontier's relationships with its competitors were adversarial rather than collusive. See Potter Decl. at ¶ 6 (describing United's refusal to enter into code-sharing agreements with Frontier, Frontier's refusal to join the Air Transport Association ("ATA") or become a founding member of Orbitz, and Frontier's filing of a complaint in 1997 with the U.S. Department of Justice against United). In addition, Frontier has offered evidence that the employment history of the two men, whom plaintiffs allege carried the knowledge of conspiratorial activity from their former employment with other airlines to Frontier, cannot give rise to an inference of knowledge of wrongful conduct. See Frontier's Mot. Summ. J., Exh. Q (Supp. Decl. of Potter) at ¶¶ 4-6; Menke Dep. at 11. Frontier's motion will be allowed.

---

[15] "'Signaling' is a pejorative term as used in this context. Its import is either that a competitor is inviting all to make a traditional price-fixing agreement, or that there already exists such an agreement and it is being carried out through indirect communications." Holiday Wholesale, 231 F. Supp. 2d at 1275.

*5. Defendant America West*

America West also offers specific evidence in support of its contention that each decision to cut and/or cap base commissions was made independently, including deposition testimony, affidavits, and an internal document analyzing the risks and benefits of making one such cut. Plaintiffs offer only the close temporal proximity[16] of some of America West's cuts as circumstantial evidence that they were made in agreement with other airlines, but in light of the specific evidence offered by America West, plaintiff's evidence is insufficient to withstand the motion. Furthermore, the fact "that price changes by one [defendant] were quickly met by the others . . . . establishes only that the producers consciously paralleled each other's prices." Blomkest Fertilizer, 203 F.3d at 1032. See also Holiday Wholesale, 231 F. Supp. 2d at 1297 ("no inference . . . may be drawn from the speed with which competitors followed price increases").

Plaintiffs also argue that America West was "privy to the signaling and price-fixing with respect to air fares that occurred in the late 1980s and early 1990s" because "the Government identified America West . . . as [a] co-conspirator" in the *ATP* litigation, and that such past "involvement . . . is probative of [its] knowledge of the subsequent conspiracy . . . and tends to exclude the possibility of independent action . . . ." Pls.' Br. Opp. at 31. However, as America West points out, the "evidence" offered by plaintiffs in support of this argument is a set of responses to interrogatories produced during discovery in the *ATP* litigation, which is of questionable

---

[16] America West's base commission cuts appear to have occurred within a range of three days to two years after other airlines decided to make base commission cuts. See Pls.' Br. Opp. at 4; America West's Reply Br. at 6. Plaintiffs' comment that America West's base commission cuts, which occurred shortly after a major airline's initial announcement, could not possibly have been made after a careful analysis because "according to Frontier, at least a month would be needed to evaluate share gains from paying higher commissions[,]" Pls.' Br. Opp. at 18 (citing Menke Dep. at 50-51, 53-54), is completely unconvincing. There is absolutely no evidence before the court that such a time frame is an industry standard, or even that any other airline would agree with the Frontier executive who made that statement. The statement also contradicts plaintiffs' own expert witness as discussed supra, n.14.

admissibility in the instant litigation,[17] stating that it was the contention of the United States that America West participated as a co-conspirator in the activities alleged in the *ATP* complaint. The court notes that, for whatever reason, the United States did not include America West as a named defendant in that litigation, and furthermore stated that "America West *withdrew from the conspiracy* . . . when it ceased using the ATP fare dissemination system . . . ." Pls.' Br. Opp., Exh. PX 202 at 4 (emphasis added). Furthermore, as discussed <u>supra</u>, the *ATP* litigation concluded in a settlement which is neither evidence of nor an admission to any prior acts of antitrust conspiracy.

Plaintiffs point to the fact that America West is a "charter associate member[]" of Orbitz, and a "Domestic Airline Partner" of Hotwire, Pls.' Br. Opp. at 8, but have no evidence that America West has participated in any collusive activity through its memberships in these business ventures. Plaintiffs' specific bone of contention with Orbitz appears to be the timing of two base commission reductions in light of Orbitz organizational meetings and a capital contribution call Orbitz made on its founding members. <u>See</u> Pls.' Br. Opp. at 8. However, America West was not a founding member of Orbitz, and has never owned any interest in Orbitz. Decl. of J. Scott Kirby ("Kirby Decl.") at ¶ 11. The court is not convinced that airlines with no ownership interest in these two websites possess the "knowledge, experience, opportunity, and motive to conspire derived . . . from the[ir] . . . associations" that plaintiffs argue they do, Pls.' Br. Opp. at 9, particularly in the absence of any evidence that could lead to such an inference. America West is also a member of the IATA, PTCC, and ATA, but it has never participated in a meeting of either the IATA or the PTCC. Kirby Decl. at ¶ 12. America West's motion will be allowed.

---

[17] "Under Federal Rule of Civil Procedure 56(e), only admissible evidence may be offered in opposition to a motion for summary judgment." <u>Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp., et al.</u>, 805 F. Supp. 1277, 1284 (D.S.C. 1992)(citing Wright & Miller, <u>Federal Practice and Procedure</u> § 2722). <u>See also</u> <u>Merck-Medco</u>, 1999 WL 691840 at **4.

*6. Defendant Midwest Express*

"[P]laintiffs have not deposed a single representative of Midwest Express . . ., nor have they served any individualized interrogatories or document requests on Midwest Express." Midwest Express' Br. Supp. Mot. Summ. J. at 4. In a mere two paragraphs in opposition to Midwest Express' motion for summary judgment, plaintiffs simply note that "Midwest Express has matched three of the six commission actions taken by the major carriers" and quote that portion of the affidavit of a Midwest Express director stating that after other airlines implemented a commission cap in 1995, Midwest Express did not do so and instead "initiated an extensive four-year analysis of any potential increase in the amount of tickets sold by travel agents as a result of maintaining an uncapped commission . . . . [which] concluded that Midwest Express failed to realize any measurable gains from its decision." Pls.' Br. Opp. at 21-22 (quoting Aff. of Carol S. Reda ("Reda Aff.") at ¶ 8). Although plaintiffs remark that this analysis merely "allegedly guided Midwest Express in its decisions to match the later commission actions[,]" Pls.' Br. Opp. at 22, plaintiffs offer no evidence to contradict or even doubt the sworn affidavit, while the affidavit offers overwhelming evidence that each commission action taken by Midwest Express was the result of an independent business judgment. See Reda Aff. at ¶¶ 9 (describing Midwest Express' consideration of an alternative commission floor and higher cap that were both rejected due to costs of implementation and possible complications); 10-13; 14 (noting that Midwest Express continues to pay travel agents a base commission of 5% capped at $10.00).

In addition, "Midwest Express does not have an equity interest in . . . Orbitz . . . and was not involved in its creation[; it] . . . is not now, nor has it ever been, a member of the" IATA or PTCC, nor does it even "have an alliance with any other air carrier that is a member of IATA or [PTCC]."

18

Reda Aff. at ¶¶ 16-17. Although Midwest Express is a member of the ATA, the court notes that while one purpose of the IATA/PTCC meetings was to come to commission agreements (albeit for travel agents outside the United States) among members, plaintiffs make no such argument and offer no such evidence with respect to the ATA, see Pls.' Br. Opp. Joint Mot. at 13-15, and therefore plaintiffs' description of the ATA as one of "numerous opportunities [for defendants] to lay the groundwork for their conspiracy," id. at 35, is unconvincing. No such allegation is contained in plaintiffs' Third Amended Complaint, and it is well-settled that "'the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.' Indeed, the opportunity to fix prices without any showing that [defendants] actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire." Williamson Oil, 2003 WL 22171708 at *31 (quoting Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1456 (11th Cir. 1991).[18] See also Moore, 819 F.2d at 712. Midwest Express' motion will be allowed.

---

[18] In their 6 October 2003 response, plaintiffs specifically disagree with this portion of the Williamson Oil opinion, stating that it "conflicts directly with the Fourth Circuit's enumeration of 'opportunity to conspire' and 'high level of interfirm communications' as a plus factor in the Merck-Medco decision." Pls.' 10/6/03 Resp. at 4 (italics in original). Even if plaintiffs are correct, the evidence they have produced is insufficient to overcome the motion(s) for summary judgment under the holding in Merck-Medco. In that case, the plaintiff produced evidence of "over 450 instances of contact [in approximately 3 ½ months] between defendants and others[,]" and were able to show a direct correlation between those contacts and defendants' desire to thwart plaintiff's efforts to secure a contract for the prescription drug benefits program for employees of the State of Maryland, but still were unable to produce evidence to support an inference of concerted action. Merck-Medco, 1999 WL 691840 at **3, **14. Plaintiffs here have merely shown occasional trade association meetings, such as IATA meetings that occurred approximately once a year, and meetings of the board of directors for Orbitz, which take place "every three months or so[,]" Caminiti Dep. at 14. Not only are these instances of contact far more infrequent, they also are not convincingly related to the conspiracy alleged by plaintiffs absent some speculative inferences.

19

*7. Plaintiffs' Motion for Partial Summary Judgment against Northwest and KLM*[19]

In 1992, Northwest and KLM entered into a "Commercial Cooperation and Integration Agreement" ("the Agreement"), to integrate their operations in the transatlantic market. Aff. of Dan Shulman ("Shulman Aff."), Exh. 4 (copy of the Agreement), ¶ 1.1. The Agreement proposed, among other things, to "establish[] . . . a unified commission schedule, including agency, group, and override commissions to be agreed upon" by the two defendants. Id. ¶ 2.2.3. Northwest and KLM then submitted the Agreement to the DOT ("the Application") for approval and a grant of antitrust immunity for the Agreement under the Federal Aviation Act. Shulman Aff., Exh. 5 (copy of the Application). The Application went through a period of DOT review and public comment, and was essentially approved, with certain exceptions not relevant to the instant motion, by order ("DOT Order") entered 11 January 1993. Shulman Aff., Exh. 7 (copy of DOT Order). Afterward, Northwest and KLM began to act in concert in setting all U.S. travel agent commissions on international flights, an activity that continues to this day. Pls.' Mem. Supp. Mot. Part. Summ. J. at 4-5. Plaintiffs argue that these defendants "do not have antitrust immunity for acting in concert to cap, reduce, and eliminate travel agent commissions[,]" id. at 2, while Northwest and KLM argue that "plaintiffs are barred from challenging [their] coordinated commission activities" in this court because those activities are within the exclusive domain of the DOT pursuant to the DOT Order, Defs.' Br. Opp. Mot. Part. Summ. J. at 13.

It is clear "that the Federal Aviation Act does not completely displace the antitrust laws." Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 387 (1973). "One of the most

---

[19] The court considers this motion immediately prior to the joint motion, because Northwest and KLM are two of the joint defendants, because it is undisputed that they expressly agreed on travel agent commissions in the U.S. on international flights that they operated together, and because the only question is whether their concerted action is in violation of antitrust law and/or a grant of immunity issued by the DOT in 1993.

conspicuous exceptions would be the combination or agreement between two air carriers involving trade restraints . . . . But where, as here, the [DOT] . . . authorizes as in the public interest specific transactions between [two airlines], . . . [the actions of the airlines are] under the surveillance of the [DOT], not in the hands of those who can invoke the sanctions of the antitrust laws. " Id. (citing Timken Co. v. United States, 341 U.S. 593, 598 (1951)). In order to find that a transaction enjoys antitrust immunity, it must meet "two prongs: the court must find (1) that the conduct charged was approved by a specific order of the [DOT] or was clearly contemplated by such an order and (2) that the [DOT] monitored and supervised the conduct complained of." Great Plains Airline Shareholders Ass'n, Inc. v. Frontier Airlines, Inc., 662 F.2d 394, 395 (5th Cir. 1981)(internal quotations omittted)(citing Hughes Tool Co., 409 U.S. at 389).[20] "[I]ndividualized approval is not necessary for antitrust immunity, so long as the alleged conduct is clearly within the contemplation of prior [DOT] orders . . . . [I]t suffices if the alleged conduct is the kind of conduct the [DOT] has approved and authorized . . . ." Scroggins v. Air Cargo, Inc., 534 F.2d 1124, 1131 (5th Cir. 1976)(internal quotation and citation omitted).

Plaintiffs' argument in support of their motion essentially boils down to one issue: that Northwest and KLM do not enjoy antitrust immunity for any jointly implemented reductions in base commissions that are the subject of this litigation, because the DOT "neither approved nor clearly contemplated that Northwest and KLM would jointly reduce and eliminate travel agent [base] commissions . . . ." Pls.' Reply Br. at 3. Plaintiffs contend that because the Application states that the Agreement will allow Northwest and KLM "to penetrate travel agent business more effectively

---

[20] Plaintiffs appear to dispute only the first prong; the court notes that the DOT Order contemplates continued supervision, as it requires Northwest and KLM to "submit [any] . . . subsidiary agreements implementing the . . . Agreement for prior approval[.]" DOT Order at 21.

by enabling travel agents to obtain commissions and commission overrides for their combined bookings . . . .[,]" Application at 6, "the conduct for which Northwest and KLM now claim immunity[,] [the reduction of base commissions,] is totally contrary to the conduct for which they represented they were seeking immunity[,]" and therefore could not have been contemplated by the DOT when it approved the Agreement. Pls.' Reply Br. at 2.

Plaintiffs further argue that the "[A]pplication did not request exemption from the antitrust laws to fix base commissions for travel agents" at all, Pls.' Br. Supp. Mot. Part. Summ. J. at 3, but it is abundantly clear that the Agreement, Application, and DOT Order all contemplate the joint setting of base commissions for U.S. travel agents. The preliminary approval order, which was incorporated into and made final by the DOT Order, see DOT Order at 18, expressly notes that Northwest and KLM "intend to create a unified travel agency commission program." Shulman Aff., Exh. 6 (copy of preliminary approval order), at 4. Furthermore, the Agreement states that the "unified commission schedule" is to be "agreed upon from time to time[,]" Agreement at ¶ 2.2.3, which clearly indicates a periodic review of the commissions set. As the DOT Order notes, "the antitrust laws allow competitors to form joint ventures so long as the venture promotes competition and economic efficiency and does not unnecessarily restrict competition by the venture's partners." DOT Order at 11. If other airlines are able to increase their profit margins by reducing base commissions, a proposition that even plaintiffs would not dispute, Northwest and KLM would be put at a clear competitive disadvantage if the court were to read the DOT Order as limiting antitrust immunity to agreements to raise base commissions. Therefore, any complaint regarding Northwest

and KLM's compliance with the DOT Order is a matter for the DOT and not for this court.[21]

Finally, plaintiffs' claim that Northwest and KLM's "admission . . . that . . . they were operating 'as if they were a single carrier[,]'" Pls.' Reply Br. at 5-6, somehow proves that IATA meetings formed the linchpin of the alleged conspiracy at the crux of this litigation is without merit. Northwest and KLM were acting within the scope of their antitrust immunity under the DOT Order in agreeing on base commissions on international flights for U.S. travel agents, and any discussion between Northwest and KLM prior to or following IATA meetings (of which there is no evidence) is not proof that other airlines engaged in concerted activity, nor is it proof that either Northwest or KLM then engaged in concerted activity with other airlines. Plaintiffs' motion will be denied.

## 8. *The Joint Motion*[22]

There is evidence that at least some of the defendants considering initiating or matching base commission cuts were concerned about losing market share if the contemplated cut was not matched by competitors; evidence that at least some of the defendants assumed the contemplated cut would not be sustainable without competitor matching; and evidence that at least some of the defendants assumed that when a competitor initiated a base commission cut, it hoped that others would match

---

[21] To the extent plaintiffs offer evidence that Northwest views the Agreement as permitting it "to make decisions [regarding commissions] for KLM out of North America[,]" Sear Dep. at 51-52, this likewise is within the purview of the DOT and well outside the scope of the instant litigation before the court, which is limited to alleged antitrust activity in setting base commissions for travel agents in the U.S. It may also be outside the subject matter jurisdiction of this court. See Turicentro, S.A. v. American Airlines, Inc., 303 F.3d 293 (3rd Cir. 2002)(alleged conspiracy by domestic airlines to fix commissions paid to foreign travel agents, where the conspiracy caused no injury which was felt in the U.S. or which affected the American economy in any way, is outside the subject matter jurisdiction of the United States courts under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a).

[22] American and Delta both joined in the joint motion and filed separate motions for summary judgment, but the separate motions were accompanied only by declarations and state that they are relying upon the memorandum filed in support of the joint motion. Therefore, the court will not consider these motions separately from the joint motion, and will include the declarations in the evidence in support of the joint motion. In addition, as the court briefly noted in its introduction, plaintiffs have filed a motion for partial summary judgment against Northwest and KLM, two of the joint defendants.

23

the cut.[23] Brunger Dep. at 51, 64; Dep. of Vince Caminiti (Delta) ("Caminiti Dep.") at 21-22; Gunn Dep. at 75-76, 109-110; Lenza Dep. at 114; Pomerantz Dep. at 31; Sear Dep. at 25, 27. However, it is clear that none of the joint defendants (and indeed, none of the defendants in this action) discussed possible commission cuts with its competitors prior to implementing those cuts. Brunger Dep. at 52; Gunn Dep. at 78, 181-82, 191; Macenczak Dep. at 80-81, 122; Pomerantz Dep. at 26. Delta actually required employees working on implementing commission caps to sign nondisclosure agreements. Macenczak Dep. at 122. Various defendants analyzed possible competitor responses to commission cuts, which the court finds to be a strong indicator that there was no actual agreement among the airlines, as it shows that airlines considering base commission cuts were uncertain of their rivals' potential reactions. Gunn Dep. at 130-33; Fox Dep. at 106; Macenczak Dep. at 78 (members of team appointed to consider base commission cut were not at a consensus as to possible rival reactions).

The defendants offer overwhelmingly compelling evidence that the commission cuts and caps that are the subject of this litigation were just as likely the result of competitive conduct and natural

---

[23] However, this does not mean that the defendants agreed to cut commissions by "offer and acceptance" as plaintiffs contend. Pls.' Br. Opp. Joint Mot. at 24. "The public announcement of a pricing decision cannot be twisted into an invitation or signal to conspire; it is instead an economic reality to which all other competitors must react." United States v. General Motors, 1974 Trade Cas. ¶ 75253 (E.D. Mich. 1974). Furthermore, plaintiffs' reliance on the Supreme Court's holding in Interstate Circuit v. United States, 306 U.S. 208 (1939), in support of their "offer and acceptance" theory is misplaced. In Interstate Circuit, there was evidence of written proposals seeking agreement to concerted action, which were followed by a "substantial unanimity of action[,]" and the Supreme Court concluded that the district court had correctly inferred an agreement from that evidence. Interstate Circuit, 306 U.S. at 216 n.3, 221. Here, plaintiffs have no evidence even approaching the level of evidence before the court in Interstate Circuit. See also Holiday Wholesale, 231 F. Supp. 2d at 1276 (noting that "the cases which have found that an inference of traditional agreement from indirect communications took place show far more detailed communications [than public announcements] with no public purpose")(citing In re Medical X-Ray Film Antitrust Litig., 946 F. Supp. 209, 213 (E.D.N.Y. 1996); In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 906 F.2d 432, 459-60 (9th Cir. 1990)).

24

changes in the market as of the illegal conspiracy alleged by plaintiffs. When Northwest cut its

commission from 8 to 5 percent, it maintained a base commission of 8 percent in markets where it

competed heavily with another airline. Pomerantz Dep. at 87. When considering whether to match

base commission cuts implemented by competitors, US Air "always look[ed] at whether there's a

way to tweak it in some way where [it] could get a little more benefit than the competition could get

. . . ." Fox. Dep. at 46.

Perhaps the most compelling evidence offered by the defendants to explain the decisions to

implement or match base commission reductions is the economic state of the airline industry. At

the time Delta implemented the first commission caps in 1995, it was in such bad shape financially

that it had implemented the first employee layoff in its history, terminating approximately 20,000

employees, and it therefore chose to take a significant risk in an area that would not impact the rest

of its workforce. Macenczak Dep. at 58, 118. At various points during the time frame that is the

subject of this litigation, other airlines were in similarly dire financial straits. Brunger Dep. at 101

(1995 Continental document describing airline industry as "an industry struggling to stay alive");

Gunn Dep. at 94; Macenczak Dep. at 73 ("It had been widely publicized that none of [the airlines]

was extremely profitable."), 267 (Delta was again "close to going out of business" after 11

September 2001). Four defendants are currently undergoing bankruptcy proceedings. The airline

industry is particularly oligopolistic; its competitive nature requires airlines to respond quickly to

rivals' initiatives. Dep. of Susan Clements (Air Canada) at 75 ("in this industry . . . you're watching

the marketplace"); Gunn Dep. at 75, 137; Macenczak Dep. at 134.

Plaintiffs' proffered "plus factors" offer no evidence tending to exclude the possibility that

defendants engaged in independent decision-making. Plaintiffs make much of trade press articles

and interviews, claiming that these articles were part of a "culture of signaling" to which defendants "were experienced and attuned[.]" Pls.' Br. Opp. Joint Mot. at 6-7. However, the evidence demonstrates that, in answering trade press interviewers' questions (knowing those answers would be published) or in reading trade press articles containing statements made by competitors, defendants neither intended to communicate anything specific to their competitors nor did they interpret such articles to be specific communications by their competitors. Bowers Dep. at 81-90; Fox Dep. at 53; Gunn Dep. at 39, 107-109; Macenczak Dep. at 38-40, 134. In September 1994, Delta sent a series of letters to various trade publications in an attempt to end industry speculation about where it was looking to reduce costs under its Leadership 7.5 Program, Macenczak Dep. at 109-110; this is a legitimate purpose sufficient to rebut any implication that the letters were an attempt to communicate with competitors. See Merck-Medco, 1999 WL 691840 at **14 (defendant's newspaper advertisement was intended to communicate with consumers, not encourage other defendants to refuse to join plaintiff's pharmacy network). Furthermore, it appears that plaintiffs do not even contend that the base commission cuts and caps at issue in the instant litigation were supported by signaling through the trade press; rather, they "were facilitated though a series of alliances, trade associations, and other cooperative ventures." Pls.' Br. Opp. Joint Mot. at 11. See also Joint Defs.' Reply Br. at 16-17.

> In sum, the court finds [p]laintiffs' theory of signaling among [defendants] to be based on . . . ominous readings of typical industry reporting on strategy. To reach the inferences suggested would require the jury to engage in speculation and does not tend to exclude the possibility that [d]efendants acted independently . . . . Because in competitive markets, particularly oligopolies, companies will monitor each other's communications with the market in order to make their own strategic decisions, antitrust law permits such discussions even when they relate to pricing because the "dissemination of price information is not itself a per se violation of the Sherman Act."

Holiday Wholesale, 231 F. Supp. 2d at 1275-76 (quoting United States v. Citizens & Southern Nat'l Bank, 422 U.S. 86, 113 (1975)).

Plaintiffs' contention that memberships in "alliances, trade associations, and other cooperative ventures" such as the IATA, the PTCC, the ATA, and Orbitz facilitated base "commission fixing[,]" Pls.' Br. Opp. Joint Mot. at 11, is equally unconvincing. As the court has previously discussed, mere memberships and associations in such organizations, without more, do not create a plus factor or even an inference of conspiracy. Furthermore, it does not appear that any "alliances" between the joint defendants and other carriers produced any agreement in restraint of trade. See supra n.13 and accompanying discussion. Although plaintiffs note that "foreign alliance partners" of the joint defendants participate in PTCC discussions on travel agent commissions for countries outside the United States, and PTCC resolutions on these commissions are filed as public documents with the DOT, Pls.' Br. Opp. Joint Mot. at 14, these facts do not tend to exclude the possibility that the joint defendants engaged in unilateral conduct in reducing base commissions for travel agents in the United States.[24] Although it is possible to infer that "the foreign [PTCC]

---

[24] Furthermore, Mr. Rein's report indicates that plaintiffs' characterizations of the PTCC display a fundamental misunderstanding of the PTCC's activities. For example, although plaintiffs insinuate that the public filing of PTCC resolutions with the DOT somehow facilitates an antitrust conspiracy among the defendants, the PTCC files these resolutions because it is required to do so by United States law. Rein Report at 10. In addition, the court is not even convinced that these commission resolutions constitute agreements in restraint of trade under the Sherman Act, because U.S. carriers are not required to follow them, and the resolutions are only effective under a "rule of unanimity." "[A] unilateral decision by a single carrier to oppose revalidation [of a resolution] amounts to a veto causing a rescission of the resolution . . . . Members . . . that are no longer supportive of a resolution are likely to act in the manner they are proposing regardless of whether the PTCC follows their recommendation." Rein Report at 3-4, 15. Because any PTCC member may unilaterally choose to discontinue following a resolution, the court is unconvinced by plaintiffs' argument that the IATA's removal of Resolution 016a (which set a base commission of 9 percent for travel agents outside the United States) from the handbook for Canadian travel agents before the resolution was actually rescinded indicates that "IATA was aware that the airlines had agreed on what the result [of the proposed rescission] would be." Pls.' Br. Opp. Joint Mot. at 16-17. As plaintiffs concede, Air Canada had proposed the rescission of Resolution 016a, Pls.' Br. Opp. Joint Mot. at 17, and therefore there was no reason for the IATA to believe that Resolution 016a would continue to be followed in Canada. "Neither IATA nor the PTCC has an enforcement mechanism . . . . [and] [a]ny carrier, by itself, can cause the rescission of a resolution at such time that it no longer wishes to have that resolution in effect." Rein Report at 4.

27

agreements provided a mechanism to establish and revise, and to monitor and enforce agreements to coordinate[,] . . . . [i]n the absence of some palpable tie between these overseas activities and [defendant]s' pricing actions in the United States," the mere fact of defendants' memberships in the PTCC does not tend to exclude the possibility that defendants acted independently. Williamson Oil, 2003 WL 22171708 at *29 (internal quotations omitted). By plaintiffs' own concession, defendants did not reduce commissions until three to four months after IATA meetings and did not participate in PTCC discussions, Pls.' 10/6/03 Resp. at 5-6, and the court cannot conclude that there is a "palpable tie" between the IATA/PTCC activities and the conspiracy alleged by plaintiffs.

Plaintiffs have made no showing that the joint defendants actually conspired through these associations, alliances and business ventures, while defendants have put forth evidence that they did not participate or engage in any discussions of base commissions at any meetings of these organizations. Caminiti Dep. at 133 (no "discussion . . . that Orbitz would result in the elimination of commissions"); Gunn Dep. at 208 (participants in Orbitz meetings "are extremely careful that we don't talk about distribution related issues"); Lenza Dep. at 163 ("we do not talk about commission in Orbitz meetings, period"); Dep. of Margaret Ashworth (United) at 218-20 (never present during PTCC discussions of travel commissions); Dep. of Bert W. Rein at 74-75 (United States carriers leave the room during PTCC discussions of agent commissions). Furthermore, although plaintiffs allege the conspiracy began in 1995 or earlier, Pls.' 10/6/03 Resp. at 5-6 (citing Third Am. Cplt. ¶ 37), "the first discussions among airlines about forming an online travel agency occurred in 1999" after ATA discussions of forming a website foundered. Defs.' Br. Supp. Joint Mot. at 48 (citing Caminiti Dep. at 105; Lenza Dep. at 22-29). "[T]he court finds it illogical that a statement made . . . four years after the initiation of the alleged conspiracy and related to a circumstance that could not

28

have been anticipated [at the inception of the conspiracy] . . . would be direct evidence of an alleged conspiracy engaged in by the" defendants for the four years preceding the statement. <u>Holiday Wholesale</u>, 231 F. Supp. 2d at 1273. The court is equally unconvinced that Orbitz' capital call of $60 million from its founders in July 2001 somehow caused an agreement among the joint defendants to further reduce base commissions in August 2001. Pls.' Br. Opp. Joint Mot. at 22. At most, plaintiffs have shown that some defendants were faced with an impending expense for which they had to find money from somewhere. "To reach the inferences suggested [by plaintiffs] would require the jury to engage in speculation and does not tend to exclude the possibility that [d]efendants acted independently." <u>Holiday Wholesale</u>, 231 F. Supp. 2d at 1275-76.

Plaintiffs' purported "structural plus factors" are unfounded under antitrust law. Plaintiffs point to the oligopolistic nature of the economic market in which the defendants compete, Pls.' Br. Opp. Joint Mot. at 27, citing such issues as "entry barriers" which "inhibit[] entry in the airline business[,]" <u>id.</u> at 29; a 30 percent vacancy rate on the airlines during the time period at issue, <u>id.</u> at 27; the "large number of [small] ticket agen[cies] scattered throughout the United States, <u>id.</u>; and an upward sloping supply curve, <u>id.</u> at 28;[25] but "no case suggests that mere participation in an oligopolistic market constitutes conduct illegal under the antitrust laws." <u>Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.</u>, 964 F.2d 335, 342 (4th Cir. 1992)(citing <u>Theatre Enters., Inc. v. Paramount Film Dist'g Corp.</u>, 346 U.S. 537 (1954); <u>E.I. duPont de Nemours & Co. v. Federal Trade Comm'n</u>, 729 F.2d 128 (2nd Cir. 1984)). Plaintiffs also argue that the "product" they offer defendants (<u>i.e.</u>, airline ticketing services) is highly fungible, Pls.' Br. Opp. Joint Mot. at 27; the

---

[25] The joint defendants particularly dispute this last argument as being "plainly wrong." Joint Defs.' Reply Br. at 11 n.9. Without deciding whether it is wrong, the court finds it to be unpersuasive.

court questions how this relates to the substance of plaintiffs' allegations, and in any event, "[p]articularly when the product in question is fungible, . . . courts have noted that parallel pricing lacks probative significance." Blomkest Fertilizer, 203 F.3d at 1033 (citing Bendix Corp. v. Balax, Inc., 471 F.2d 149, 160 (7th Cir. 1972)). See also E.I. Du Pont de Nemours & Co., 729 F.2d at 139 ("price uniformity is normal in a market with few sellers and homogeneous products"); Weit v. Continental Illinois Nat'l Bank & Trust Co., 641 F.2d 457, 463 (7th Cir.)("Courts have noted that parallel pricing or conduct lacks probative significance when the product in question is standardized or fungible."), cert. den., 455 U.S. 988 (1982).

Additionally, plaintiffs' claim that the only close substitute for their ticket-writing services is the ability of the airlines to write their own tickets, thus encouraging "'attempt[s] to raise price above cost . . . .[,]'" Pls.' Br. Opp. Joint Mot. at 28, completely undercuts and misses the nature of the antitrust violation they have alleged. It is undisputed by the parties that travel agents present the most expensive avenue of ticket distribution for defendants, and that airlines now have the ability to distribute tickets through substantially less expensive channels, including e-ticketing, the internet, and airline-operated telephone reservations systems. Therefore, it is quite possible that the decline in travel agent base commissions does not represent an attempt by defendants to raise the price of ticket writing above the cost of ticket writing, but rather reflects the quite logical ambition of defendants to bring the cost of distributing their tickets through travel agents more in line with the cost of distributing their tickets through other means. For the same reason, plaintiffs' argument that defendants' high ratio of fixed costs (such as fuel and equipment) to variable costs (such as travel agent commissions) "makes collusion unusually attractive", Pls.' Br. Opp. Joint Mot. at 28, is equally unavailing. If anything, the fact that base commissions for travel agents is one of the few

30

areas in which defendants can look to reduce their business costs makes the base commission reductions just as likely the result of competitive conduct and natural changes in the market as of the illegal conspiracy alleged by plaintiffs.

Plaintiffs point to defendants' publication of base commissions on the computer reservations systems used by travel agents to book tickets, systems that provide base commission information for all airlines to travel agents and defendants alike, and claim it "is a factor that facilitates collusion, in that it is a deterrent to cheating on an agreement [to fix base commissions], inasmuch as an increase in base commissions by any airline would be known immediately to the other airlines." Pls.' Br. Opp. Joint Mot. at 28. Yet the Supreme Court has held that "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." United States v. U.S. Gypsum Co. 438 U.S. 422, 443 n.16 (1978). Therefore, the court is not convinced that the fact that the defendants' base commission rates are available for all to see tends to exclude the possibility that defendants engaged in unilateral conduct.

Plaintiffs also offer "behavioral plus factors" to support their claims of conspiracy and collusion. Plaintiffs assert that "defendants . . . acted uniformly to cap, cut, and eliminate travel agent base commissions . . . . On each occasion, each defendant took exactly the same action as the others . . . . [and] they acted substantially simultaneously," Pls.' Br. Opp. Joint Mot. at 29-30. Even assuming that each defendant's commission action was identical and essentially simultaneous to each other defendant's commission action, an assumption with which both the joint defendants and the court are inclined to disagree, the fact "that price changes by one [defendant] were quickly met by the others . . . . establishes only that the [defendants] consciously paralleled each other's prices."

31

Blomkest Fertilizer, 203 F.3d at 1032. Plaintiffs' argument that defendants have substantially departed from an established business practice "without extensive economic study and analysis[,]" Pls.' Br. Opp. Joint Mot. at 30-32, ignores both case law and substantial evidence offered by defendants to the contrary. Plaintiffs may not "'ignore[] inconvenient evidence,' and [must] 'incorporate all aspects of the economic reality of the [relevant] market.'" In re Northwest Airlines Corp. Antitrust Litig., 197 F. Supp. 2d 908, 914 (E.D. Mich.)(quoting Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056-57 (8th Cir. 2000)(referring to expert opinion in antitrust litigation), pet. den. sub nom. In re Delta Air Lines, 310 F.3d 953 (6th Cir.), cert. den. sub nom. Northwest Airlines Corp. v. Chase, 123 S.Ct. 2252 (2003). "The [c]ourt cannot assume that all defendants' pricing behavior would have remained precisely the same in the absence of . . . concerted action, for such an assumption would ignore the very economic tenets of free market behavior which underlie our antitrust laws." In re Mid-Atlantic Toyota Antitrust Litig., 560 F.Supp. 760, 786 (D. Md. 1983). Furthermore, although the court concludes that defendants have provided ample evidence that they did perform substantial analyses when presented with base commission reductions, even assuming that "little [analysis was] done to evaluate alternatives, [p]laintiffs [can] point to no evidence to support the contention that following the price [cut] was against [d]efendants' economic interests[,]" and therefore the court can only conclude that the pace at which base commission cuts were followed indicates that defendants engaged in conscious parallelism. Holiday Wholesale, 231 F. Supp. 2d at 1296. See also In re Airline Ticket Comm'n Antitrust Litig., 953 F. Supp. at 283 ("in an oligopolistic market, such as that in which the airlines operate, rapid price coalescence is the norm and is not, in itself, illegal").

Plaintiffs also argue that defendants have engaged in "economic price discrimination"

32

because "[o]verrides have generally been available only to larger agencies [and] the vast majority of travel agents have had little meaningful access to them." Pls.' Br. Opp. Joint Mot. at 31. Not only is defendants' explanation for their "disparate" treatment of various travel agents via override commissions – i.e., defendants offer the best incentives to the agents who have shown that they can generate the most revenue – completely plausible, plaintiffs' bald "contention [that defendants engaged in economic price discrimination] . . . is so underdeveloped that it cannot produce a genuine issue of triable fact." Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37, 51 (7th Cir. 1992). Plaintiffs' argument that the relative stability of "market shares among the leading firms" during the alleged period of conspiracy "is consistent with a price-fixing scheme[,]" Pls.' Br. Opp. Joint Mot. at 32, is equally unfounded. Defendants have "offered reasonable legitimate explanations" for their activities and therefore the stability of their market shares does not tend to exclude the possibility that defendants acted independently, particularly in light of a lack of any direct evidence to the contrary. In re Citric Acid Antitrust Litig., 191 F.3d at 1106 (affirming district court's grant of summary judgment for one defendant because although "the evidence in the record . . . clearly shows that several [defendants] conspired to . . . allocate market shares," the plaintiffs had no direct evidence against that defendant and therefore the evidence did "not support a reasonable inference" against that defendant).

Finally, plaintiffs argue that "[a]s commission costs have declined . . . , there has been no corresponding decline in air fares, a strong indication that commission costs have fallen because of the exercise of monopsony power, not because of competitive forces." Pls.' Br. Opp. Joint Mot. at 32. The court is completely unpersuaded that reductions in base commissions should automatically lead to lower ticket prices for consumers in a competitive market. The price of any good sold to a

33

consumer is the result of many different factors, and the ability to reduce one cost does not mean that a producer can directly pass on that cost reduction in the form of a price reduction for the consumer. That savings may have been forced from the rise of some other cost, making the producer's net profit margin (and therefore set price) the same. Once again, faced with pure speculation and in the absence of any case law or evidence to the contrary, defendants' "failure" to pass on their savings to the consumer does not tend to exclude the possibility that defendants acted independently in reducing base commissions. The motion of the joint defendants will be allowed.

*9. Defendant Air France*[26]

Plaintiffs' "evidence" against Air France essentially amounts to sinister insinuations and untenable inferences that shatter into sheer speculation in the face of Air France's uncontroverted evidence. Indeed, in their 59-page brief in opposition to the three foreign carrier motions, plaintiffs' specific discussion of Air France occupies less than 5 pages. This discussion includes Air France's membership in IATA,[27] its association in Orbitz and Hotwire, and the timing of Air France's commission reductions.

Plaintiffs twist the declarations of two Air France executives, which state that Air France would never have considered initiating a base commission cut in the United States because its U.S. market share was too small to have any influence on other airlines and because it considered travel

---

[26] Lufthansa and Air Canada also filed motions (D.E. #s 718, 722) for summary judgment. Plaintiffs filed one response to the three foreign carrier motions. As previously stated, Lufthansa has been dismissed pursuant to a settlement agreement, and the case is stayed as to Air Canada due to its bankruptcy, and therefore the court considers only Air France's motion.

[27] As with many of the smaller defendant airlines, plaintiffs do not contend that Air France joined in the alleged conspiracy at its inception in 1995, but instead allege "that [Air France] . . . knowingly joined the continuing conspiracy initiated by the major airlines, and then actively assisted and participated in that conspiracy through the IATA meetings in 1997, 1998, and 1999." Pls.' Br. Opp. Fgn. Mots. at 26.

agent backlash too great a risk, Decl. of Jean-Louis Pinson at ¶ 23 and Decl. of Franck Simian at ¶ 19, into an "admission" by Air France that the base commission reductions at issue in this litigation "can be explained only by the presence of an agreement among the [defendants] . . . , and is compelling evidence of a conscious commitment to a common scheme tending to exclude the possibility of independent action." Pls.' Br. Opp. Fgn. Mots. at 7-8.

Air France's memberships in various organizations likewise yield no evidence tending to exclude the possibility that Air France acted independently, although they do provide fertile ground for plaintiffs' imagination. For the reasons discussed with regard to other defendants, the mere fact that Air France is a "charter associate member[] of Orbitz" and an "international airline partner[] in the Hotwire website," Pls.' Br. Opp. Fgn. Mots. at 9, does not tend to exclude the possibility that Air France acted independently. Plaintiffs make much of Air France's "attendance" at five meetings of the PTCC and unnamed "other IATA groups" in 1997, 1998, and 1999. Pls.' Br. Opp. Fgn. Mots. at 13-15. Although plaintiffs offer no evidence as to the extent of Air France's participation in these meetings, according to plaintiffs, Air France's mere attendance apparently shows that it "played a key role in signaling that it was time for the industry to reduce travel agent commissions" and that it "[c]learly . . . . [was] deeply and critically involved in the [PTCC] meetings . . . ." Id. Attendance at IATA meetings was also apparently sufficient because "the meetings themselves provided ample opportunity for plotting and reaching agreement apart from the actual commission discussions" on the meetings' agendas. Id. at 43. Although the absurdity of this argument speaks for itself, it is all the more ludicrous in light of Air France's uncontroverted evidence that no "Air France representatives who attended IATA meetings had . . . [anything] to do with any Air France decision regarding . . . base commission rates to travel agencies in the United States." Air France's Reply Br.

35

at 7 (citing declarations of four Air France executives). As the court has previously stated, and despite plaintiffs' insinuations to the contrary, Air France's mere attendance at IATA meetings, without evidence of actual knowledge of, and participation in, an illegal scheme, is insufficient to allow plaintiffs to survive the motion for summary judgment. See Moore, 819 F.2d at 712; In re Citric Acid Antitrust Litig., 191 F.3d at 1098. Again, "the mere opportunity to conspire . . . does not, standing alone, permit the inference of conspiracy." Williamson Oil, 2003 WL 22171708 at *31 (internal quotations and citations omitted).

Finally, plaintiffs find the timing of Air France's base commission reductions to be suspicious. Plaintiffs argue that it "certainly bears no resemblance to independent action" that Air France did not lead any base commission cuts at all when it was in financial distress, yet followed United's reduction in 1997, when it was profitable. Pls.' Br. Opp. Fgn. Mots. at 53. This is simply a strong indicator of conscious parallelism. Plaintiffs' reading of an email discussing override commissions as evidence that Air France was not actually paying higher base commissions for almost four months in 1998 after other airlines capped base commissions on international flights, Pls.' Br. Opp. Fgn. Mots. at 53, is patently incorrect, and their interpretation is certainly not evidence sufficient to refute Air France's actual evidence that it was in fact paying higher base commissions, and was not seeing a beneficial result in market shift. See Air France's Br. Supp. Mot. Summ. J. at 9-10 (citing declarations of four Air France executives). The court notes that all of Air France's flights in the U.S. market are international and that Air France "has developed a niche market" of higher-fare tickets, id. at 2-3, indicating that Air France's decision not to cap international base commissions resulted in its actually paying higher commissions, and was not an illusory attempt to curry favor with travel agents. Finally, plaintiffs' characterization of Air France's near-six-month

36

delay in eliminating base commissions in 2002 as being "influenced by its having been made a defendant in this lawsuit and its desire to create the appearance of not belonging to the conspiracy[,]" Pls.' Br. Opp. Fgn. Mots. at 54, is ridiculous in light of Air France's evidence of an extensive study undertaken to analyze "the relative value of travel agencies to its business" before deciding to eliminate base commissions. Decl. of Richard A. Pasciuto at ¶ 27. Air France's motion will be allowed.

### B. The Protective Order

On 17 May 2001, several defendants moved for a protective order "to govern discovery and use of confidential business information." 5/17/01 Mot. at 1. Among the grounds given by the moving defendants in support of the motion were that a protective order would "provid[e] appropriate protection to the various types of confidential information that are likely to be placed at issue" and allow "[d]efendants to have a full and fair opportunity to litigate and defend this action." Br. Supp. 5/17/01 Mot. at 1, 6-7. The moving defendants asked that "confidential business information . . . . not only be shielded from public disclosure – because of its commercially sensitive and proprietary nature – but . . . [also] from discovery by . . . other airlines, with the exception of outside counsel for the defendants in this case." Id. at 3.

On 7 June 2001, Magistrate Judge Mason entered the moving defendants' proposed protective order ("the protective order") pursuant to Fed. R. Civ. P. 26(c). The protective order states that "[a]ll information produced or discovered in this litigation, regardless whether designated confidential, shall be used solely for the prosecution or defense of this litigation and for no other purpose, unless such information has become publicly available without a breach of" the protective order. Protective Order at ¶ 2.

The protective order allows parties and third parties to designate information they disclose as "Confidential" or "Confidential and Outside Lawyers Only."

> The designation "Confidential" shall be limited to information that the disclosing party *reasonably* believes is of a proprietary or commercially sensitive nature or should otherwise be subject to confidential treatment. The designation "Confidential and Outside Lawyers Only" shall be limited to information that the disclosing party *reasonably* believes contains a trade secret, is of a highly sensitive commercial nature, or should otherwise be subject to [such] . . . treatment (such as information regarding pricing, production, cost, marketing, strategic planning, or customers).

Id. at ¶¶ 5-6 (emphasis added). In order to designate a document as "Confidential" or "Confidential and Outside Lawyers Only," the disclosing party "must mark each page of each document and/or each significant component of each object . . . with the appropriate designation as required." Id. at ¶ 7. "Deposition transcripts shall presumptively be considered to have been designated 'Confidential and Outside Lawyers Only' for a period of thirty (30) days . . . [after which] the deponent, his counsel, or any other party may redesignate all or portions of the transcript . . . ." Id. at ¶ 14. Designated information may only be reviewed by certain persons. Id. at ¶ 4. "All pleadings, motions, briefs, memoranda, and related submissions *containing Confidential Information* shall be filed under seal." Id. at ¶ 16 (emphasis added).

Subsequently, the parties have filed thousands of pages under seal. Pursuant to the protective order, the parties have made their own decisions regarding the documents to be sealed. These sealed documents include memoranda, attachments and exhibits. Some parties have placed everything filed in conjunction with a motion under seal, including documents which could not possibly reasonably be considered to contain "Confidential Information," such as documents culled from the internet, court opinions, copies of newspaper or trade press articles, and annual reports for shareholders. Furthermore, although the protective order specifically permitted the filing of memoranda and briefs

under seal if they contained "Confidential Information," it is the court's opinion (absent a party's compelling argument to the contrary) that the vast majority of briefs actually filed do not contain any information necessitating sealing. Mere citations in memoranda to confidential information do not necessarily reveal any actual confidential information. Likewise, affidavits which merely aver that various copies of documents attached to the affidavit are true and correct copies do not reveal any actual confidential information.

Furthermore, it appears that the magistrate judge did not review the "motion . . . in accordance with the mandatory procedure outlined [by the Fourth Circuit] in Stone [v. University of Maryland, 855 F.2d 178 (4th Cir. 1988)]." Under Seal v. Under Seal, No. 00-1191, 2000 WL 1294239, **2 (unpublished)(4th Cir. Sept. 14, 2000). Under this mandatory procedure, the court must first "determine [whether] the source of the public's right to access" stems from the common law or the First Amendment with respect to each document to be sealed. Id. at **1. The distinction is an important one because

> [t]he common law presumes a right to inspect and copy judicial records and documents. The common law presumption of access may be overcome if competing interests outweigh the interest in access . . . . Where the First Amendment guarantees access, on the other hand, access may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest.

Stone, 855 F.2d at 180 (citations omitted). In other words, the common law protects access to all records, whereas the First Amendment right extends only to particular documents. See Under Seal, 2000 WL 1294239, at **1. Second, the court must

> (1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, (3) and provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives.

Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000)(citations omitted).

39

The foregoing steps have not been taken with respect to any of the documents that have been filed under seal in conjunction with the instant motions. While the protective order does not address the dispositive motions phase of the proceedings, that order does contemplate the use of confidential documents at trial, under guidelines to be set forth in the pre-trial order. See Protective Order at ¶ 17. Once a document is revealed in open court at trial, it becomes subject to a public right of access. See Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988); Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir. 1986). "Because summary judgment adjudicates substantive rights and serves as a substitute for a trial," there is no distinction between a trial and adjudication by the court on summary judgment. Rushford, 846 F.2d at 253. Although "there may be instances in which discovery materials should be kept under seal even after they are made part of a dispositive motion . . . . , the district court must address the question at the time it grants a summary judgment motion and not merely allow continued effect to a pretrial discovery protective order." Id. Therefore, this court must make a judicial determination as to whether the protective order should be enforced with respect to the documents submitted in conjunction with the instant motions.

The court will therefore unseal all sealed documents associated with the instant motions unless any party wishing to maintain documents under seal files, within 30 days of the date of this order, a brief complying with the Fourth Circuit's mandate, demonstrating the necessity and propriety of sealing information contained in those documents. Based on those submissions, which must address each and every document that the party wants to seal, the court will determine whether such sealing is appropriate. Depositions and documents produced or filed under seal by any defendant in bankruptcy will remain under seal until such time as the case is reopened as to that defendant.

40

## III. CONCLUSION

Simply put, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [and therefore] there is no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotation omitted).

> [I]ndividual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do not constitute an unlawful agreement under section 1 of the Sherman Act. That is not because such pricing is desirable (it is not), but because it is close to impossible to devise a judicially enforceable remedy for "interdependent" pricing. How does one order a firm to set its prices without regard to the likely reactions of its competitors?

Reserve Supply Corp., 971 F.2d at 50 (internal quotations omitted)(citing Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 484 (1st Cir.), cert. denied, 488 U.S. 1007 (1989); Theatre Enters., Inc., 346 U.S. at 541). "Taking all of the evidence together, the court is not convinced that [plaintiffs have] presented evidence to support an inference of concerted action." Merck-Medco, 1999 WL 691840 at **14. Plaintiffs "fervently believe[], and urge[] upon the [c]ourt, that it was self-evident [that] the airlines, having set their commissions at identical levels within a very short period, must have conspired to do so. Strongly held beliefs, however, do not prove the thing that is believed." In re Airline Ticket Comm'n Antitrust Litig., 953 F. Supp. 280, 283 (D. Minn. 1997). Defendants' "lists of potential nonconspiratorial reasons for commissions to decline," Pls.' Br. Opp. Fgn. Mots. at 48 n.9, while scoffed at by plaintiffs, mean that their "conduct [was] as consistent with permissible competition as with illegal conspiracy[,]" which is not a violation of the antitrust laws. Matsushita, 475 U.S. at 588.

For the foregoing reasons, defendants' motions for summary judgment are ALLOWED, and plaintiffs' motion for partial summary judgment on the issue of antitrust immunity with regard to Northwest and KLM is DENIED. The remaining motions are DENIED AS MOOT; the court did

41

not find any of the disputed evidence to be essential to the resolution of the dispositive motions. The parties are DIRECTED to file briefs to seal any desired documents as discussed supra in Part II.B within 30 days of the date of this order. The court notes that this order does not terminate the case entirely due to the four remaining defendants in bankruptcy; however, pursuant to Federal Rule of Civil Procedure 54(b), the court DIRECTS the Clerk to enter judgment as to the moving defendants, as there is no just reason for delay.

This _____30_____ October 2003.

W. EARL BRITT
Senior United States District Judge

sfh/ual/tec
order.summ.j.wpd

42